NO. 07-10-00451-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL B

APRIL 12, 2012

CLARENCE CERF, APPELLANT

v.

THE STATE OF TEXAS, APPELLEE

FROM THE 251ST DISTRICT COURT OF POTTER COUNTY;

NO. 55,527-C; HONORABLE PATRICK PIRTLE, JUDGE

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

**OPINION**

Appellant, Clarence Cerf, appeals his conviction for assault on a public servant, a third-degree felony resulting in a fifty-five year sentence. On appeal, he complains that the trial court abused its discretion by permitting him to proceed *pro se* and, secondly, by denying his motion for a continuance sought to secure defense witnesses. Finally, he complains he was denied the right to a speedy trial. We will affirm.

Factual and Procedural History

Appellant is an inmate of the William P. Clements unit of the Texas Department of Criminal Justice. On November 15, 2005, as he was escorted back to his cell from

taking a shower, he acted as if he were going into the cell but, instead, turned around and lunged at correctional officer Brittany Beard. He grabbed her, put her in a chokehold, and dragged her to the floor where he proceeded to slash her several times across her face with a razor blade. Nearby fellow officer, Oslo Essien, came to her aid and attempted to pull appellant off Beard. Additional help was summoned and quick to arrive. As additional officers approached, appellant ended his struggle with Beard and Essien and retreated to his cell. In the struggle, both Beard and Essien were cut. Beard suffered a number of significant cuts to her face and forehead.

Appellant was charged with two counts of assault on a public servant. The count alleging assault against Essien was eventually dismissed, and appellant stood trial on allegations of assault on Beard. A Potter County jury found him guilty of assaulting a public servant and assessed punishment at fifty-five years' imprisonment, a sentence the trial court stacked onto the sentence appellant was currently serving.

He appeals his conviction, contending the trial court abused its discretion by granting his mid-trial request to proceed *pro se* and by denying his motion for continuance. Finally, he contends the trial court erred by denying his motion to dismiss for denial of a speedy trial.

Waiver of Right to Counsel

Through his first issue, appellant contends the trial court abused its discretion by permitting him to proceed *pro se*.[1]

---

[1] At first glance, it appears appellant challenges both the adequacy of the trial court's admonishments regarding the waiver of his right to counsel and the propriety of

2

Applicable Law and Standard of Review

The Sixth Amendment to the United States Constitution and Article 1, Section 10, of the Texas Constitution provide that a defendant in a criminal trial has the right to assistance of counsel. U.S. CONST. amend. VI; TEX. CONST. art. 1, § 10; see also TEX. CODE CRIM. PROC. ANN. art. 1.051(a) (West Supp. 2011). However, this right to counsel may be waived, and a defendant may choose to represent himself at trial. See Indiana v. Edwards, 554 U.S. 164, 171, 128 S.Ct. 2379, 171 L.Ed.2d 345 (2008) (citing Faretta v. California, 422 U.S. 806, 807, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975)). Although the right to self-representation is absolute, a waiver of the right to counsel will not be lightly inferred, and we are to indulge every reasonable presumption against the validity of a waiver. Shamam v. State, 280 S.W.3d 271, 274 (Tex.App.—Amarillo 2007, no pet.); Manley v. State, 23 S.W.3d 172, 173 (Tex.App—Waco 2000, pet. ref'd).

For a waiver of counsel to be valid, (1) it must be an intelligent and knowing waiver, and (2) the party waiving the right must be made aware of the dangers and disadvantages of self-representation. Shamam, 280 S.W.3d at 274. In assessing the validity of a waiver of counsel, the trial court must make an inquiry, evidenced by the record, which shows that the defendant has sufficient intelligence to demonstrate a capacity to waive his right to counsel and the ability to appreciate the practical disadvantage he will confront in representing himself. Id. The trial court must

---

the trial court's determination of his competency to waive such right. However, appellant does not develop this issue in such a way as to identify any aspect of the trial court's admonishments that he claims was inadequate, and we, therefore, read his issue concerning competency as one which subsumes the admonishments argument.

determine not only that the defendant wishes to waive his right to counsel, but that he understands the consequences of such waiver.  Id.

Generally speaking, "the competence that is required of a defendant seeking to waive his right to counsel is the competence to *waive the right*, not the competence to represent himself."  Edwards, 554 U.S. at 172 (quoting Godinez v. Moran, 509 U.S. 389, 399, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993)) (emphasis in original).  So, ordinarily, "'the defendant's technical legal knowledge'" is 'not relevant' to the determination" whether a defendant is competent to waive his right to counsel.  See id. (quoting Godinez, 554 U.S. at 400).  However, the United States Supreme Court "caution[ed] against the use of a single mental competency standard for deciding both (1) whether a defendant who is represented by counsel can proceed to trial and (2) whether a defendant who goes to trial must be permitted to represent himself."  Id. at 175.  "Mental illness itself is not a unitary concept."  Id.

The Edwards Court explored some of the general principles and distinctions among its precedent on issues of the right to counsel, the waiver of that right, and competence.  See Edwards, 554 U.S. at 169–74 (discussing Faretta, 422 U.S. at 806; Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960); Drope v. Missouri, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); and Godinez, 509 U.S. at 389).  Edwards explained that Dusky and Drope, both cases dealing with competence to stand trial, "frame the question presented, but they do not answer" the precise issue at bar, "namely, the relation of the mental competence standard to the right of self-representation."  Id. at 169–70.

Examining a more closely related case, the <u>Edwards</u> Court distinguished the issue addressed by <u>Godinez</u> and rejected its implication that a single standard could apply to both competence to stand trial and competence to represent oneself at trial. <u>See</u> <u>id.</u> at 171–72. It rejected that implication in favor of its recognition that the issue of mental competence to stand trial is, by the nature of mental illness generally, a separate issue from the issue of competence to represent oneself at trial. <u>See</u> <u>id.</u> at 173. Ultimately, <u>Edwards</u> "conclude[d] that the Constitution permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so." <u>Id.</u> at 177–78. "That is to say, the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under <u>Dusky</u> but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." <u>Id.</u> at 178. The Texas Court of Criminal Appeals recognized <u>Edwards</u>'s "mental-illness-related limitation on the scope of the self-representation right" in <u>Chadwick v. State</u>, 309 S.W.3d 558, 560–61 (Tex.Crim.App. 2010).

The trial court sits in the best position to make a finely-tuned decision based on individualized circumstances regarding whether a mentally ill defendant is competent to proceed *pro se*. <u>See</u> <u>Edwards</u>, 554 U.S. at 177; <u>Chadwick</u>, 309 S.W.3d at 561; <u>Cudjo v. State</u>, 345 S.W.3d 177, 186 (Tex.App.—Houston [14th Dist.] 2011, pet. ref'd). Accordingly, because this is a mixed question of law and fact that turns on an evaluation of credibility and demeanor, we review the trial court's ruling for an abuse of discretion. <u>Chadwick</u>, 309 S.W.3d at 561. We afford almost total deference to a trial court's rulings

on mixed questions of law and fact when the resolution of the issue turns on an evaluation of credibility and demeanor. Id. We view the evidence in the light most favorable to the trial court's ruling, and we will imply any findings of fact supported by the evidence and necessary to support the trial court's ruling if it did not make explicit findings. Id.; Cudjo, 345 S.W.3d at 186.

Analysis

The trial court engaged in substantial interaction with appellant both before and after his decision to proceed *pro se*, providing the trial court abundant information with which to take "realistic account" of appellant's competence to represent himself and providing us a hearty record from which to review the trial court's determination. Prior to the pretrial hearing on appellant's motion to dismiss for denial of speedy trial, the trial court discussed with appellant the fact that he had previously undergone examinations regarding mental competence and insanity but reminded appellant that those examinations related to a prior, unrelated case. When the trial court asked if appellant had "any questions or issues with respect to competency or insanity at this time," appellant responded that he did not.

During the hearing on his motion to dismiss and, later, during a hearing on admissibility of certain State's exhibits, appellant testified in a coherent, responsive manner. He described his recollection of the events of that morning, showing that he understood the factual basis of the allegations against him. Trial began, and, throughout the State's case-in-chief, appellant remained represented by counsel.

6

The next day, appellant requested that the trial court permit him to make a record of his objections to the dismissal of the second count of the indictment, the count alleging assault on Essien.[2] The trial court explained to appellant that it could not grant relief based on any motion or request he made *pro se* but permitted appellant to voice his objections to the dismissal of the second count. In appellant's exchange with the trial court on this matter, though appellant's misuse of some terms could have made his position slightly more difficult to discern, the trial court seemed to understand the arguments appellant advanced and responded to them. Appellant's language was respectful throughout and he explained that he realized that some discussion of the matter was put into the record the day before but wanted to further develop the record of his position on the matter, demonstrating a reflective, complex thought process. Appellant demonstrated an awareness and understanding of the notion of preservation of error even though, again, his position was occasionally clouded by misused terms. Throughout the hearing, appellant seemed attentive and participated in a meaningful fashion.

Shortly after this exchange, appellant requested that he be permitted to proceed *pro se*. Appointed counsel, toward whom appellant confirmed he had no personal hostilities, questioned appellant on his decision to proceed *pro se* and also explained

---

[2] Appellant explained the bases for his objection to the dismissal of the second count. First, he feared that the State would try him for it later. Appellant also realized that the jury would hear evidence relating to his criminal history, which includes aggravated sexual assault. He did not want to leave the jury with the impression that he only attacked females. So, while his better-to-be-generally-violent-than-only-violent-toward-women approach is a risky, arguably misguided one, it is a strategy nonetheless, and it reveals appellant's awareness of both trial procedure and social mores.

the role of standby counsel, which appointed counsel would undertake if the trial court granted appellant's request to proceed *pro se* throughout the remainder of trial.

The trial court then stepped in "to make sure that [appellant is] making an intelligent decision here." The trial court explained appellant's rights and admonished him of the risks of self-representation and the standard to which he would be held if he was permitted to represent himself. The trial court described examples of the duties appellant would have to undertake and explained the limitation on help from standby counsel. As the trial court discussed self-representation with appellant, appellant reiterated his disagreement with his counsel's agreement to dismiss the second count and release Essien from the subpoena. Appellant requested that he be allowed to call another witness in an attempt to establish his defense of duress and that he be able to cross-examine an already excused witness, requests the trial court denied.

After appellant, his counsel, and the trial court further clarified and developed appellant's position and in response to the trial court's admonishments and questions, appellant expressed his understanding of the risks and responsibilities associated with his decision to proceed *pro se*. And the trial court "reluctantly" agreed to allow him to do so. Appellant then requested that the jury be charged on the defense of duress, and the trial court explained that the jury charge would be an issue addressed later. Despite revealing some misunderstanding on appellant's part of procedural matters, the record leading up to appellant's self-representation supports a finding that appellant was competent to waive counsel and proceed *pro se*. Compare Chadwick, 309 S.W.3d at 562–63 (affirming trial court's denial of appellant's right to self-representation when appellant put curses on the trial court, interrupted his attorney, launched into rambling

8

monologues and personal attacks, and filed incoherent motions), with Cudjo, 345 S.W.3d at 186 (affirming determination of competence to waive counsel when, despite evidence appellant suffered from bipolar disorder and was housed in a prison mental health unit, record showed his ability to communicate clearly, conduct himself appropriately and respectfully, proceed in an orderly fashion with trial court's guidance, ask coherent questions, lodge objections, and articulate defenses to the allegations).

Appellant's performance through the remainder of trial reflected, for the most part, a similar conclusion: despite some missteps, appellant was very much aware of the nature of the proceedings for which the parties were currently before the trial court. For the most part, he remained an active participant in the trial and was able to articulate the bases for his objections, most of them still centering on duress and the unavailability of witnesses. On direct examination, he explained that other attacks by guards throughout his years in prison led him to attack Beard. Though the cohesion of appellant's testimony deteriorated at times when he veered off topic on the stand, he remained largely engaged and usually responsive to redirection.

However, toward the end of appellant's testimony, he had to be redirected several times, and the State repeatedly objected to his testimony or commentary, as it were. It appears, at this point, that appellant had grown frustrated when his attempts to further delay trial were likewise frustrated. The trial court continued to caution and redirect him. In what appears to be a last-ditch effort to delay trial, appellant spontaneously declared that he was incompetent to stand trial. After his declaration met with no success and during cross-examination, he attempted to invoke his right to

9

remain silent. The trial court explained that he had already waived that right, and appellant appeared to understand that he had done so and continued his testimony.

After cross-examination, appellant rested, and the jury charge conference was held, in which he rather clearly objected to the trial court's refusal to instruct the jury on duress. Then, appellant presented a brief but coherent closing argument in which he properly addressed the trial court and the jury, expressed remorse for the event, added that he did not act intentionally or knowingly, and explained to the jury that he was not able to procure all the witnesses to fully establish his defense of duress.

On appeal, appellant contends that his first, poorly-timed request for a jury instruction on duress clearly indicates "that appellant was not fully competent to make a decision to proceed *pro se*." To the contrary, we would characterize such a maneuver as indicative only of the quality of his self-representation and as highlighting a hazard of self-representation of which appellant was warned. That, after having been properly admonished, appellant made tactical or procedural errors in his self-representation does not render him incompetent to have waived his right to counsel.

The trial court did not explicitly find that appellant was competent to waive counsel and represent himself, but we are permitted to imply any findings of fact supported by the evidence and necessary to support the trial court's ruling in the absence of explicit findings. See Chadwick, 309 S.W.3d at 561, 563. In light of the record demonstrating appellant's ample interaction with the trial court and viewing that evidence in a light most favorable to the trial court's ruling, we conclude that the record supports the implied finding that appellant was competent to waive his right to counsel.

10

Accordingly, we conclude that the trial court did not abuse its discretion by permitting appellant to represent himself, and we overrule his first issue.

Denial of Motions for Continuance

Appellant contends that the trial court abused its discretion when it denied his several requests for additional time to locate and subpoena defense witnesses.  The Texas Code of Criminal Procedure permits a continuance upon a written, sworn motion. See TEX. CODE CRIM. PROC. ANN. arts. 29.03, 29.08 (West 2006).  The Texas Court of Criminal Appeals has consistently held that articles 29.03 and 29.08 mean what they say: motions for continuance must be in writing and sworn, and, in the absence of a written, sworn motion, a defendant preserves nothing for our review.  Dixon v. State, 64 S.W.3d 469, 472 (Tex.App.—Amarillo 2001, pet. ref'd) (citing Dewberry v. State, 4 S.W.3d 735, 755 (Tex.Crim.App. 1999), and authorities cited therein).

Appellant's attempt to cast the continuance issue in terms of the constitutional right to compulsory process does not change our analysis.  A similar contention was unsuccessfully presented to the Texas Court of Criminal Appeals and met with a reminder that the failure to abide by the procedural requirements of articles 29.03 and 29.08 will result in forfeiture of that complaint:

> A defendant's constitutional right to a meaningful opportunity to present a complete defense is rooted in the Fourteenth Amendment's Due Process Clause and the Sixth Amendment's Compulsory Process and Confrontation Clauses.  Confrontation and compulsory process rights are subject to procedural default.  And, in Broxton v. State, we held that Broxton forfeited his claim that he was denied the right to present a defense and the right to due process and due course of law under the United States and Texas Constitutions because he failed to lodge a proper objection at trial.  As a result, we conclude that [appellant] forfeited his appellate challenge to the trial judge's denial of his unsworn oral

11

continuance motion by failing to comply with procedural requirements of Articles 29.03 and 29.08.

Anderson v. State, 301 S.W.3d 276, 280 (Tex.Crim.App. 2009) (citations omitted).

Having been directed to no authority that would dictate otherwise, we conclude that appellant's oral motions for continuance during trial did not preserve error. See Dixon, 64 S.W.3d at 472–73. According, we overrule his second issue.

Right to a Speedy Trial

Finally, appellant contends that the trial court erred by denying his motion to dismiss based on the denial of his right to a speedy trial.

Applicable Law and Standard of Review

We analyze federal constitutional speedy trial claims "on an ad hoc basis" by weighing and then balancing the factors outlined in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972): (1) length of delay, (2) reason for delay, (3) assertion of right, and (4) prejudice to the accused. Cantu v. State, 253 S.W.3d 273, 280 (Tex.Crim.App. 2008). A delay that is unreasonable enough to be considered presumptively prejudicial triggers the Barker analysis. Id. at 281; see Doggett v. United States, 505 U.S. 647, 651–52, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992).

We review the trial court's ruling on a speedy trial issue under a bifurcated standard of review, applying "an abuse of discretion standard for the factual components, and a *de novo* standard for the legal components." Zamorano v. State, 84 S.W.3d 643, 648 (Tex.Crim.App. 2002). Review of the individual Barker factors necessarily involves factual determinations and legal conclusions, but "[t]he balancing

test as a whole . . . is a purely legal question." Id. at 648 n.19 (quoting Johnson v. State, 954 S.W.2d 770, 771 (Tex.Crim.App. 1997)).

Analysis

(1) Extent of Delay

A Potter County grand jury returned its indictment against appellant for the instant offense on April 4, 2007. Trial was held on October 11, 2010. The delay, then, encompassed a time period of just over three and one-half years. Authority supports the conclusion that this delay is sufficiently long to be "presumptively prejudicial" and, thus, serves to trigger our examination of the remaining three Barker factors. See Shaw v. State, 117 S.W.3d 883, 889 (Tex.Crim.App. 2003) (concluding that thirty-eight-month delay was sufficient to trigger examination of other Barker factors). This rather lengthy delay weighs in favor of a finding that appellant's right to a speedy trial was denied. See id.

(2) Reason for delay

The State bears the burden of justifying the delay. Emery v. State, 881 S.W.2d 702, 708 (Tex.Crim.App. 1994). We assign various weights to various reasons for the delay. See Dragoo v. State, 96 S.W.3d 308, 314 (Tex.Crim.App. 2003); Zamorano, 84 S.W.3d at 649. When the record is silent regarding the reason for the delay, we presume neither a deliberate attempt on the part of the State to prejudice the defense nor a valid reason for the delay. Dragoo, 96 S.W.3d at 314.

13

Here, the record reveals that appellant was serving a thirty-five year sentence imposed in December 2002 for aggravated sexual assault and aggravated robbery. Prior to his transfer to the Clements Unit, where this incident occurred, he was imprisoned in the Preston E. Smith Unit in Dawson County for a period of time during which he was indicted for harassment of a correctional officer at that unit. He was indicted in Dawson County on March 6, 2006, and tried on those charges on August 18, 2008. That said, during some of the delay at issue here, appellant was preparing for earlier filed charges in Dawson County. So, although the State's argument and proof on that issue is not overwhelming, some of the delay could be attributable to that unrelated proceeding. See Dragoo, 96 S.W.3d at 314 n.4; see also Easley v. State, 564 S.W.2d 742, 745 (Tex.Crim.App. 1978) (concluding "[t]hat the appellant was being prosecuted on other charges constitutes a valid reason for the delay in bringing him to trial"); McIntosh v. State, 307 S.W.3d 360, 367 (Tex.App.—San Antonio 2009, pet. ref'd) (observing that "prosecution of the defendant on other charges may be a valid reason for a delay in bringing him to trial," provided the State "offer[s] argument and proof to sustain its burden on this factor"). That portion of the delay, the sixteen and one-half months between indictment in the instant cause and trial in Dawson County, finds some justification in the record.

The record also shows that the trial court originally set the cause for trial on July 12, 2010. Appellant moved for a continuance, and the cause was reset for trial on October 11, 2010. So, three months of the delay are attributable to the defendant.

The record is silent as to the reason for the remainder of the delay–between the Dawson County trial and the first, July 2010 trial setting in the instant case. That nearly

14

two-year delay remains unexplained in the record. In the face of such silence, we presume neither a deliberate attempt on the part of the State to prejudice the defense nor a valid reason for the delay. Dragoo, 96 S.W.3d at 314. Ultimately, this factor weighs very little in favor of or against a finding of a speedy trial violation.

(3) Assertion of right

Appellant is responsible for asserting his right to a speedy trial. State v. Munoz, 991 S.W.2d 818, 825 (Tex.Crim.App. 1999). Appellant first asserted his right by way of a motion filed on February 4, 2010, seeking a speedy trial.[3] The record shows that no action was taken on that motion. The trial was set for July 12, 2010. In June 2010, appellant sought and was granted a continuance.[4] Trial was reset for October 11.

Appellant filed another motion asserting his right to a speedy trial, this time in a motion to dismiss the case, days before trial. It becomes relevant to our analysis that, in this motion, filed only days before trial, appellant asserted his right to a speedy trial, not by requesting that he be brought promptly to trial–trial was only days away–but, instead, by seeking dismissal. See Cantu , 253 S.W.3d at 283. That a defendant seeks dismissal, rather than prompt trial, is relevant to this factor. See id. The timing of the motion lends more weight to the conclusion that appellant's goal was to get *no* trial, not a speedy one. See id.

---

[3] While represented by counsel, appellant filed *pro se* motions arguably asserting his right to a speedy trial, but it appears the trial court took no action on those *pro se* motions as was within its authority. See Robinson v. State, 240 S.W.3d 919, 922 (Tex.Crim.App. 2007). Even if we were to consider his *pro se* motions as proper assertions of his right, they were not made until December 2009, over two and one-half years from the date he was indicted.

[4] We note that appellant's attorney provided notices from other courts in which he had already been set to appear during that week.

Appellant first asserted his right to a speedy trial in February 2010, nearly three years after he was indicted. Trial was originally scheduled for July 2010. Appellant was granted a continuance, and trial was ultimately held in October 2010. Considering appellant's apparent nearly three-year acquiescence to the delay, his late assertion of his right, which is further weakened by his motion seeking dismissal only days before trial, weighs heavily against his claim that he was denied his right to a speedy trial. See Doggett, 505 U.S. at 658 (concluding any "presumption of prejudice" associated with lengthy delay is extenuated by the defendant's acquiescence in the delay).

(4) Prejudice

We consider this factor in light of the interests the right to a speedy trial was designed to protect: (1) oppressive pretrial incarceration, (2) excessive anxiety over the pending charges, and (3) impairment of an accused's ability to present a defense. Barker, 407 U.S. at 532. The defendant bears the burden of making an initial showing that the delay was prejudicial. Munoz, 991 S.W.2d at 826. When the defendant makes a *prima facie* showing of prejudice, the burden shifts to the State to show that the defendant suffered "no serious prejudice beyond that which ensued from the ordinary and inevitable delay." Id. (quoting Ex parte McKenzie, 491 S.W.2d 122, 123 (Tex.Crim.App. 1973)).

Here, pretrial incarceration is not a significant issue because the record shows that appellant was serving a significant term of imprisonment at the time of the incident and still had a significant length of time to serve, having been sentenced to serve a thirty-five-year sentence in December 2002. At the hearing on his motion to dismiss,

16

appellant testified to having experienced anxiety and loss of his memory of the event. Appellant also complains that the delay operated to prejudice his ability to prepare his defense. He maintains that Officer Essien had moved from the Amarillo area, and another inmate, Jeremy Blaylock, a witness he sought to testify regarding the defense of duress, had passed away sometime between the 2005 incident and the 2010 trial.

As to the issue surrounding Essien's testimony, we first observe that Essien's unavailability was more closely related to the dismissal of the allegations that appellant assaulted him rather than the delay. Further, because the allegation of assaulting Essien had been dismissed, appellant was not called on to defend any allegations relating to Essien. Other than whatever value Essien's testimony would have in terms of showing the jury that appellant did not attack only women, appellant makes no showing as to how Essien's unavailability, one less to do with the delay and more to do with the dismissal of the second count of assault, prejudiced his ability to defend himself against the allegations at bar.

As to the unavailability of Blaylock, whose testimony appellant sought in order to establish his defense of duress, we have no record of when he passed away such that it could be fairly concluded that his unavailability as a witness was attributable to the delay in bringing appellant to trial rather than the natural course of life and death. Further, appellant's "duress" claim appears to have been based on his mistreatment from other correctional officers over the years, a claim that falls short of establishing that appellant was under duress when he attacked Beard. In other words, unless Blaylock could have testified that appellant attacked Beard "because he was compelled to do so by threat of imminent death or serious bodily injury to himself or another," then his

17

testimony would lend nothing to establish a duress defense to the allegations being tried. See TEX. PENAL CODE ANN. § 8.05(a) (West 2011). Appellant makes no assertion that Blaylock's testimony would be of such a nature. Any prejudice related to the fact that Blaylock was no longer available to testify as to appellant's duress claim was minimal at most and would lend only very slight weight to a finding that appellant's right to speedy trial was violated. Based on an evaluation of all the considerations related to this factor, we conclude that the effect is rather neutral, and, if it weighs at all in favor of appellant's claim, the scale tips only slightly in favor of that claim.

After balancing the Barker factors, we conclude that the trial court did not err in denying appellant's motion to dismiss. We overrule his third and final issue.

## Conclusion

Having overruled appellant's three issues on appeal, we affirm the trial court's judgment of conviction.

Mackey K. Hancock
Justice

Publish.