

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-17-00427-CR

EARL WASHINGTON, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

On Appeal from the 364th District Court
Lubbock County, Texas
Trial Court No. 2009-422,738, Honorable William R. Eichman II, Presiding

October 10, 2018

## MEMORANDUM OPINION

Before QUINN, C.J., and PIRTLE and PARKER, JJ.

Earl Washington, appellant, appeals his murder conviction. The events underlying the conviction suggest gang rivalry and retribution. The decedent, John Wilkerson, was the victim of what some would consider a drive-by shooting. As he stood, a vehicle containing appellant and two others approached him. Shots were fired. The approaching vehicle left, and Wilkerson lay on the ground with fatal bullet wounds.

Three issues pend for our review. Through the first, appellant contends that the trial court denied him his constitutional right of compulsory process. The second concerns

the trial court's decision to exclude the testimony of an inmate to whom Pat Davis allegedly confessed as being the one who killed Wilkerson. Via the final issue, we are asked to determine whether the trial court erred in refusing to suppress appellant's statements made over the course of several interviews with detectives. We affirm.

*Issue One – Compulsory Process*

We initially address appellant's allegation that he was denied his constitutional right to compulsory process. The record indicates that he had subpoenaed, three days before trial began, a witness who lived in Dallas. Several days into trial and shortly before the State completed its presentation of evidence, appellant asked the court to issue a writ of attachment for the subpoenaed witness. The request was granted. Because the witness lived in Dallas, appellant then attempted to have the Dallas County district clerk issue the writ. They did not return his calls. By that time, the State had completed its portion of the guilt phase, and appellant had begun presenting his defense.

Eventually, appellant "move[d] for a continuance to be able to compel this witness to testify." He explained that he undertook several unsuccessful attempts to contact the witness and said: "So we ask - even if it is just for the morning to see if we can get that writ . . . executed . . . then I'm asking for a continuance to get that witness here, because . . . my client is guaranteed that right by the Constitution of the United States." The trial court granted appellant a continuance for "this morning only" to determine "if they've served her with the writ, or if they can't find her." It then said that

> I don't know [if] she's a necessary witness or not, number one.
> Number two . . . we've been trying this case for over a week,
> even if . . . the writ of attachment was served or sent to Dallas
> County on Friday . . . that's a weekend of the trial. I mean,
> she was served on the 25th of August. So, I'm not going to

2

postpone it indefinitely. I will grant a continuance for the rest of the morning.

While the proceeding was recessed, appellant succeeded in contacting Dallas County officials. They allegedly informed him that they had attempted to execute the writ, found the witness' residence, failed to find the witness, and would attempt to execute the document later that evening. The situation led appellant to "move[] for additional time to get that witness present." He did not present any evidence suggesting that the Dallas County officials would meet with success or that the witness would be found. In answer to the request for further postponement of the trial, the court replied with: "I'm going to deny that motion at this time." After a brief exchange with defense counsel, the court reiterated: "I'm denying your motion for continuance."

Appellant purportedly needed the missing witness to rebut evidence presented by the State. That evidence was used by the State to develop appellant's alleged motive for killing Wilkerson. According to appellant, the missing witness would testify that the events from which such motive supposedly arose did not occur. He now argues that: "[u]nder the Compulsory Process Clause, [appellant] had a constitutional right to present this rebuttal eyewitness testimony. The trial court, however, refused to give [him] *a short continuance* so as to allow [him] time to get his witness to Lubbock. In so ruling, the trial court hamstringed [appellant's] entire defense and violated his constitutional rights." (Emphasis added). We overrule the issue.

Though placed under the umbrella of a constitutional right to compulsory process, appellant complains of the trial court's refusal to grant him "a short continuance." The continuance in question was his second. Again, one had been granted for the morning, as requested by appellant. Once it was determined that the witness was not found when

3

officials attempted to serve the writ, the trial court denied appellant's second oral request for postponement.

Statute provides that a "criminal action may be continued on the written motion of the State or of the defendant, upon sufficient cause shown." TEX. CODE CRIM. PROC. ANN. art. 29.03 (West 2006). Such a motion must also be "sworn to by a person having personal knowledge of the facts relied upon for the continuance." *Id.* art. 29.08. Appellant filed no written motion for continuance sworn to by one having personal knowledge of the facts. Thus, he did not preserve his complaint about being denied a "short continuance" to secure a witness. *See Anderson v. State*, 301 S.W.3d 276, 279 (Tex. Crim. App. 2009) (holding that "if a party makes an unsworn oral motion for a continuance and the trial judge denies it, the party forfeits the right to complain about the judge's ruling on appeal"); *accord Blackshear v. State*, 385 S.W.3d 589, 591 (Tex. Crim. App. 2012) (holding the same). That he may couch his complaint in the vernacular of the Sixth Amendment right to compulsory process is of no consequence. His request for a continuance to assure enjoyment of that right still had to comply with the aforementioned statutes; that is, it still had to be in writing and made under oath. *Anderson,* 301 S.W.3d at 280; *Cerf v. State*, 366 S.W.3d 778, 787 (Tex. App.—Amarillo 2012, no pet.). We overrule the issue.[1]

*Issue Two – Exclusion of Evidence*

Appellant next asserts that the trial court erred in excluding testimony that Pat Davis confessed to a "fellow inmate" that he (Davis) not only boasted about how he hurt people but also murdered John Wilkerson. We overrule the issue.

---

[1]Because preservation of error is a systemic requirement on appeal, a court of appeals should review preservation of error regardless of whether the issue was raised by the parties. *See Bekendam v. State*, 441 S.W.3d 295, 299 (Tex. Crim. App. 2014); *see also Haley v. State*, 173 S.W.3d 510, 515 (Tex. Crim. App. 2005)

Though appellant was denied opportunity to have Gordon Granberry reiterate Davis' comments about killing John Wilkerson, he succeeded in having like statements admitted via at least one other witness. The individual testified to hearing Davis yell: "I'm a killer. They can't play me. Oh, yeah, I did it. I killed that nigger, John." Once that was said, appellant's counsel then asked: "And did you also say that you never knew that Pat Davis was involved in John-John's murder until that night because it came out of his own mouth?" To that, the witness answered: "Well, I actually didn't know who all was involved, but by me hearing that made - it confirmed that he was a part of them." Assuming *arguendo* that the trial court erred in excluding Granberry's testimony reiterating another instance about Davis admitting his complicity, the error was harmless given that substantially identical evidence was admitted elsewhere without objection. *See Womble v. State*, 618 S.W.2d 59, 62 (Tex. Crim. App. [Panel Op.] 1981) (observing that "[t]his court has consistently held reversal is not required by exclusion of evidence where the same testimony was later admitted without objection"); *Pierce v. State*, No. 05-12-00940-CR, 2013 Tex. App. LEXIS 9876, at *10 (Tex. App.—Dallas Aug. 7, 2013, pet. ref'd) (not designated for publication) (stating that "[i]t is well settled that an error in admission or exclusion of evidence is cured where the same evidence comes in elsewhere without objection"); *Edwards v. State*, No. 07-03-0221-CR, 2004 Tex. App. LEXIS 3736, at *3-4 (Tex. App.—Amarillo Apr. 28, 2004, no pet.) (mem. op., not designated for publication) (stating that "[t]he standard on exclusion of cumulative evidence and harmless error dictates that no harm results when evidence is excluded if other similar evidence is admitted").

*Issue Three – Custodial Interrogation*

5

We next address appellant's last issue. Again, he asserts that the trial court erred in denying his motion to suppress statements given to detectives investigating the murder. The statements were made while appellant was within federal custody. Appellant had invited the detectives to come talk with him about the occurrence. They did, but without recording the interviews or mirandizing appellant. That purportedly rendered the appellant's statements inadmissible. We overrule the issue.

The decision of the trial court to deny a suppression motion is reviewed under the standard of abused discretion. *Applin v. State*, No. 07-17-00214-CR, 2018 Tex. App. LEXIS 6681, at *5 (Tex. App.—Amarillo Aug. 22, 2018, no pet.) (mem. op., not designated for publication). Per that standard, we afford almost complete deference to its determinations of historical facts but review *de novo* its application of those facts to the law. *Id.* The standard also obligates us to recognize the trial court as the sole trier of fact and judge of witness credibility. *Id.* at *5-6; *accord Lerma v. State*, 543 S.W.3d 184, 189-90 (Tex. Crim. App. 2018) (stating the same). So too does it require us to view the evidence of record in a light most favorable to the trial court's ruling. *Lerma,* 543 S.W.3d at 189-90.

Next, inculpatory statements of one in custody normally are inadmissible unless the declarant was informed of his *Miranda*[2] rights, and the statements were taken in conformity with article 38.22 of the Texas Code of Criminal Procedure. *See Herrera v. State*, 241 S.W.3d 520, 525 (Tex. Crim. App. 2007) (stating that "[u]nwarned statements obtained as a result of custodial interrogation may not be used as evidence by the State in a criminal proceeding during its case-in-chief"); TEX. CODE CRIM. PROC. ANN. art. 38.22,

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

§ 2(a) (West 2018) (stating that "[n]o written statement made by an accused as a result of custodial interrogation is admissible as evidence against him in any criminal proceeding unless . . . "). The former consists of telling the individual that he has the right to remain silent, that any statement made may be used as evidence against him, that he has the right to have an attorney present during questioning, and that, if he is unable to hire an attorney, he has the right to have an attorney appointed if he cannot afford one. *Lamper v. State*, No. 07-18-00035-CR, 2018 Tex. App. LEXIS 6788, at *7-8 (Tex. App.—Amarillo Aug. 24, 2018, no pet. h.) (mem. op., not designated for publication). Article 38.22 also requires that the declarant be told of those rights. *Id.*; *see also* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2(a)(1)-(5) (prohibiting the admission in a criminal proceeding of a written statement made by an accused "as a result of custodial interrogation" unless the face of the statement shows that the accused, prior to making the statement was told 1) he had the right to remain silent and not make any statement at all and that any statement he made may be used against him at his trial; 2) any statement he made may be used as evidence against him in court; 3) he had the right to have a lawyer present to advise him prior to and during any questioning; 4) if he were unable to employ a lawyer, he had the right to have one appointed to advise him prior to and during any questioning; and 5) he had the right to terminate the interview at any time). But, it adds another admonition; that is, the person must also be told that the he has the right to terminate the questioning at any time. TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2(a)(5); *Lamper*, 2018 Tex. App. LEXIS 6788, at *7-8.

Here, appellant was interviewed multiple times by detectives investigating the murder of Wilkerson. The interviews apparently were conducted in a room or holding cell

7

monitored or controlled by federal authorities at the time given that he was in the custody of federal authorities. None of those interviews were preceded with the detectives mirandizing appellant or admonishing him that he could terminate the interview. And, because appellant believed himself to be in custody at the time, he concludes that the trial court was obligated to suppress the information he provided. The dispute, however, centers on whether appellant was actually in custody as that term is construed for purposes of *Miranda* and article 38.22. This is so because an individual's Fifth Amendment rights do not come into play if he is not in custody and any interrogation is not yet custodial. *Killebrew v. State*, No. 01-17-00367-CR, 2018 Tex. App. LEXIS 6890, at *10 (Tex. App.—Houston [1st Dist.] Aug. 28, 2018, no pet.) (mem. op., not designated for publication). The same is also true regarding compliance with *Miranda* and article 38.22; the interrogator need not abide by either if the interview is not custodial. *Id.*

Custody usually arises either when one is formally arrested or when the person's freedom of movement has been restrained to the degree associated with a formal arrest. *Nguyen v. State*, 292 S.W.3d 671, 677 (Tex. Crim. App. 2009); *see Herrera v. State*, 241 S.W.3d at 525 (quoting *Miranda*, 384 U.S. at 444, and defining custodial interrogation for purposes of *Miranda* as "'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way'"). And, whether one is in custody presents a mixed question of law and fact. *Herrera*, 241 S.W.3d at 526. So too does the burden lie with the defendant or person being questioned to establish that he was in custody. *Id.*; *Carmona v. State*, No. 07-17-00018-CR, 2018 Tex. App. LEXIS 6185, at *5 (Tex. App.—Amarillo Aug. 7, 2018, pet. filed) (mem. op., not designated for publication).

Furthermore, analysis of the topic encompasses the examination of all the objective circumstances surrounding the questioning. *Herrera*, 241 S.W.3d at 525. The interrogator's subjective belief that the individual being questioned is a "suspect" may be one of those circumstances, but that is so only when the belief is somehow imparted to the alleged suspect. *Id.* Otherwise, it is irrelevant. *Id.* That the interview occurred while the person was jailed on unrelated charges may also form a component of the equation. But, as said in *Herrera*, "incarceration does not always constitute 'custody' for *Miranda* purposes when an inmate is questioned by law enforcement officials 'regarding an offense separate and distinct from the offense for which he was incarcerated.'" *Id.* at 531 (quoting *United States v. Menzer*, 29 F.3d 1223, 1231 (7th Cir. 1994)). In such situations, we still apply the "traditional 'custody' analytical framework'". *Id.* at 532. And, the focus remains on two discrete inquiries into 1) the circumstances surrounding the interview and 2) given those circumstances, whether a reasonable person could have felt he was not at liberty to end the interview and leave. *Id.* Yet, some differing indicia should be considered in making those inquires. Though not exclusive, they are 1) the language used to summon the prisoner or detainee, 2) the physical surroundings of the interview, 3) the extent to which the detainee is confronted with evidence of his guilt during the interview, 4) the pressure, if any, exerted on the person being questioned, 5) a change in the person's surroundings which result in added restriction upon the detainee's freedom, 6) the detainee's ability to leave the interview when he chooses, and 7) the purpose, place, and length of questioning. *Id.*; *Carrasco v. State*, No. 07-14-00001-CR, 2015 Tex. App. LEXIS 10790, at *12 (Tex. App.—Amarillo Oct. 20, 2015, pet. ref'd) (mem. op., not designated for publication).

In analyzing the issue at bar, appellant spent little time discussing the factors alluded to in *Herrera*. Instead, he began by accusing the State of engaging in "shallow analysis" below. Yet, the burden lay with him to prove custody, not the State to disprove it. And, here his effort focused on 1) whether or not the detectives had basis to believe and actually believed he was a suspect in their murder investigation, 2) the detectives appeared at the investigation for the purpose of gaining evidence while suspecting him of Wilkerson's murder, 3) the detectives' concession that appellant was in custody, and 4) his purported belief that he had been granted immunity.

As for the matter of appellant being considered a suspect, he fails to cite us to evidence that either detective revealed to him (in some form or fashion) during the interviews that he was a suspect. So, whether or not they actually viewed him as a suspect at the time is irrelevant per *Herrera*.

Next, it is true that the detectives testified that appellant was in "custody" when the interviews occurred. Nonetheless, the trial court obviously viewed those statements as meaning something other than custody for the purposes of the interrogation being conducted by the detectives. If this were not so, then its decision, most likely, would have differed.

Obviously, appellant was in custody at the time of the interviews. He was being held by the United States. He apparently had been arrested and detained pending some federal criminal prosecution. So, he was not free to leave the facility within which the federal government was housing him and the interviews were transpiring. Yet, as held in *Herrera,* being incarcerated does not *ipso facto* equate custody for purposes of affording the inmate his *Miranda* warnings or otherwise complying with article 38.22 of the Texas

Code of Criminal Procedure. So, merely asking a detective whether appellant was "in custody" under these circumstances is hardly the concession that appellant suggests it to be. It is hardly the concession that appellant was in custody for purposes of admonishing him per *Miranda* and complying with article 38.22.

Furthermore, one detective would eventually clarify that appellant was in custody "in Midland" where federal authorities were holding appellant. That suggests the detective was referring to federal custody when acknowledging appellant's status as being in custody, not custody for purposes of the interviews. The same is true of the other detective. He said appellant was "in custody" when appellant initially made contact from Midland after being arrested by federal authorities and as part of a "federal proffer." The initial contact from Midland happened before the detectives interviewed appellant there. So, this detective referring to appellant being in custody also can be viewed as reference to appellant being in federal custody as opposed to custody relative to *Miranda* and article 38.22, or so the trial court could have reasonably construed the testimony.

Indeed, it would have behooved the litigants to have created a relevant framework for the detectives before the latter were asked vague questions of law and fact like "was appellant in custody." While one can see why a defendant may want to leave the term "custody" vague in situations akin to that at bar, pivotal witnesses should be provided definitions of legal terms before being asked questions and applying them to various facts. Luckily the context within which the detectives spoke here was enough to indicate that they did not favor appellant with the concession he wants us to believe they gave him.

As for the purported belief that he had immunity, that may or may not be indicia in the custody equation. After all, *Herrera* did not purport to itemize an exclusive list of

11

circumstances.  Nevertheless, evidence appears of record indicating that while in federal custody, appellant sought to cooperate in the Wilkerson investigation.  He apparently opted to do so as a means of minimizing a potential federal prison sentence.  So, appellant initiated contact with the detectives, and they drove to Midland (and later Ector) County where he was being held.[3]  Four law enforcement officials, appellant, and appellant's attorney were present when the first interview occurred.  At that time, one of the detectives may have told appellant that if he provided useful information which did not inculpate him in a violent crime, the information would not be used against him.[4]  Given this, a detective may have said things that led appellant to believe he had some type of immunity.

But, appellant's believing he had immunity impacts the inquiry in a manner that he may have not expected.  It  would suggest that 1) he did not think he was subject to prosecution for the murder investigation and 2) his *own* guilt for the murder was not a matter of discussion by either appellant or the detectives.  Again, one of the indicia to peruse is the extent to which the detainee was confronted with evidence of his guilt during the interview.  Being told his comments would not be used against him tends to weigh against the possibility that the detectives were mining for evidence with which to prosecute appellant or otherwise accusing appellant of the murder during the interviews.

---

[3] Evidence indicates that this was not the first time appellant initiated contact with those investigating the murder.  He apparently did so shortly after the killing.  After appellant made contact, a detective went to his house and transported him to the police station.  The detective returned him to his house once appellant gave a statement.  Other evidence suggests that appellant had a pre-existing relationship with one of the detectives wherein he would provide information regarding other investigations.

[4] We say "may have told" because the detective was somewhat unclear on this at the suppression hearing, and neither the State nor appellant sought to clarify his testimony.

We next note that the transcript memorializing the suppression hearing says little about what was asked and answered. It says little about the physical surroundings in which the interviews were conducted (other than it being a facility in the control of federal authorities) or the tenor of the questions being asked. Whether they were aggressive or accusatory is unknown, though one detective likened the exchanges to a "free flow." Nor is anything said about the length of the interviews or the effect, if any, the interviews had upon the nature of appellant's continued confinement by the federal authorities. On the other hand, it does reveal a general willingness on the part of appellant to talk. Not only did he initiate the interrogations, he also asked if there was anything else he could help with as the detectives stood to leave the first interview. At that time, his attorney also invited the detectives to speak with his client in the future at their pleasure. During the second interview instigated by appellant, he apparently began the exchange by handing the detectives a letter he had written prior to their arrival.

Reading the evidence of record in a light most favorable to the trial court's ruling, we conclude that it would have permitted the trial court to reasonably infer that appellant was quite comfortable with the environment in which the questioning occurred and felt little to no pressure from the detectives to interact with them. It could even have led the trial court to infer that appellant felt somewhat in control. This seems supported by his instigation of the meeting. To that we add evidence of his telling others that 1) "I am going to do what is right. Every move I make is going to be beneficial;" 2) "Blondie [Detective Koontz] . . . has been on my ass . . . trying to catch me slipping but I always made wise decisions;" 3) "I know a lot [sic] of real homies that make deals when the feds make threats so that's where I step in at because I need a deal;" and 4) "[m]y every move is a great

13

move." These comments appeared in letters written at the time he was meeting with the detectives.[5] In their totality, the circumstances evince a bit of manipulation on appellant's part to utilize the interviews as a means of helping himself via proceedings he was free to begin and end. They did not compel the trial court to find that appellant was ***in custody*** when they occurred, despite his being incarcerated. That, in turn, obligates us to deem the trial court's refusal to grant appellant's motion to suppress as a legitimate exercise of discretion.

We overrule appellant's issues and affirm the trial court's judgment.


Brian Quinn
Chief Justice


Do not publish.

---

[5] These letters may not have been before the trial court at the suppression hearing, and normally our review is limited to the record developed at the hearing. *Black v. State*, 362 S.W.3d 626, 631 (Tex. Crim. App. 2012) (quoting *Hardesty v. State*, 667 S.W.2d 130 (Tex. Crim. App. 1984). Yet, appellant said he renewed at trial his objections to the use of his interview statements. So, the matter was reopened. That would authorize us to consider evidence presented at trial to assess whether the trial court should have suppressed the statements. *Id.* at 635-36. Additionally, appellant himself referred to correspondence with others when arguing that he was led to believe he was the beneficiary of immunity. That correspondence was not part of the suppression hearing. So, to the extent that appellant opened the door to extraneous evidence touching upon matters of suppression, we see little problem in walking through it and perusing other correspondence from him written during the same period.